UNITED STATES *v.* ANTONY GIBBS & CO., INC. (No. 3302)[1]

[1] T. D. 44066.

United States Court of Customs and Patent Appeals, May 19, 1930

*Charles D. Lawrence*, Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States.

*Walden & Webster* (*Edward F. Jordan* of counsel) for appellee.

[Oral argument April 18, 1930, by Mr. Lawrence and Mr. Jordan]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This is a Government appeal from the judgment of the United States Customs Court, First Division, holding a woven fabric to be dutiable as "haircloth known as 'crinoline'" at 35 per centum ad valorem under the provisions of paragraph 1426 of the Tariff Act of 1922. The merchandise had been classified by the collector under paragraph 1109 of said act and was assessed for duty at 37 cents per pound and 50 per centum ad valorem. The cloth is composed of wool, cotton, alpaca, and Tunisian goat hair—56 per centum hair, 33 per centum wool, and 11 per centum cotton, in weight. It seems to be conceded that hair is the component material of chief value. The issues in this case involve a consideration of paragraph 1109 in connection with the provisions of paragraph 1120.

The paragraphs of the Tariff Act of 1922 involved herein follow:

PAR. 1109. Woven fabrics, weighing more than four ounces per square yard, wholly or in chief value of wool, valued at not more than 60 cents per pound, 24 cents per pound and 40 per centum ad valorem; valued at more than 60 cents but not more than 80 cents per pound, 37 cents per pound and 50 per centum ad valorem; valued at more than 80 cents but not more than $1.50 per pound, 45 cents per pound upon the wool content thereof and 50 per centum ad valo-rem; * * *.

PAR. 1120. Whenever in this title the word "wool" is used in connection with a manufactured article of which it is a component material, it shall be held to include wool or hair of the sheep, camel, Angora goat, Cashmere goat, alpaca or other like animals, whether manufactured by the woolen, worsted, felt, or any other process.

PAR. 1426. Haircloth, known as "crinoline" cloth, haircloth, known as "hair seating," and hair press cloth, not specially provided for, 35 per centum ad valorem; hair felt, made wholly or in chief value of animal hair, not specially provided for, 25 per centum ad valorem; manufactures of hair felt, including gun wads, 35 per centum ad valorem; cloths and all other manufactures of every description, wholly or in chief value of cattle hair or horsehair, not specially provided for, 40 per centum ad valorem.

The testimony in the case consists of pages 9 to 24, inclusive, of the record, together with the record in protest 101814–G found on pages 25 to 73, inclusive, which latter record was incorporated. The record

contains the deposition (30 pages in length) of James Lockwood Wood, the English manufacturer.

In protest 101814–G, T. D. 42698, 53 Treas. Dec. 373, the same parties and the same kind of merchandise were before the lower court, and the protest of importer, claiming the merchandise to be dutiable under paragraph 1426 as haircloth known as "crinoline" cloth, was sustained. The Government did not appeal from that judgment, and a new case (this one) was made up and tried before the lower court, which followed its former decision. From the judgment in the latter case this appeal was taken.

It is not seriously disputed here that the merchandise is described in paragraph 1109 when considered with paragraph 1120. Importer contends that its goods are more specifically described in paragraph 1426, which contention the Government disputes. The Government argues, quite forcefully, that the imported merchandise can not be classified under paragraph 1426 even though directly described therein, since certain facts show that Congress did not intend such a result. As a basis for this argument the Government points out that in *Oberle & Henry* v. *United States*, T. D. 27792, 12 Treas. Dec. 649, the Board of General Appraisers held that goods invoiced as hair press cloth and returned for duty at 44 cents per pound and 50 per centum ad valorem under the provisions of paragraph 366 of the Tariff Act of 1897 were dutiable thereunder rather than as claimed by the importer under the provisions of paragraph 431 of said act. This case was appealed to the United States Circuit Court, which, without opinion, affirmed the judgment of the Board of General Appraisers. From the judgment of the Circuit Court an appeal was taken to the United States Circuit Court of Appeals, which affirmed the lower court. The decision of the Circuit Court of Appeals was in November, 1908. It is the contention of the Government that Congress legislated with this decision in view and that, therefore, it was presumed to have given legislative sanction to the judicial interpretation as found in said decisions.

This question did not seem to be stressed in the court below as no mention of the decision is found in the opinion or in the opinion in T. D. 42698. The *Oberle* case involved paragraph 366 of the Tariff Act of 1897 when considered with paragraph 383 of said act, and also paragraph 431 of the same act, which paragraphs, in part, follow:

366. On cloths, knit fabrics, and all manufactures of every description made wholly or in part of wool, not specially provided for in this Act, valued at not more than forty cents per pound, the duty per pound shall be three times the duty imposed by this Act on a pound of unwashed wool of the first class; * * *.

383. Whenever, in any schedule of this Act, the word "wool" is used in connection with a manufactured article of which it is a component material, it shall be held to include wool or hair of the sheep, camel, goat, alpaca, or other animal, whether manufactured by the woolen, worsted, felt, or any other process.

431. Haircloth, known as "crinoline" cloth, ten cents per square yard; haircloth, known as "hair seating," and hair press cloth, twenty cents per square yard.

There would be much force in the Government's position if the paragraphs and the merchandise under consideration in the case at bar and the paragraphs and merchandise under consideration in the *Oberle* case were identical or sufficiently similar to justify the application of the rule of legislative adoption of judicial decision. It will be noted that there is considerable difference in the construction of the two haircloth paragraphs, and that the *Oberle* case involved a consideration of *hair press cloth*, while the instant case involves a consideration of *haircloth* known as *"crinoline" cloth*.

Paragraph 431 of the Tariff Act of 1897 differs from paragraph 1426 of the Tariff Act of 1922 in the fact that the first three articles mentioned in paragraph 1426 bear the same rate of duty, while in paragraph 431 different rates of duty are assessed and also in the fact that there is an n. s. p. f. provision in paragraph 1426 and none in paragraph 431. The greatest difference between the two paragraphs, as affects this issue, according to the contention of the importer, is that in paragraph 1426 Congress has included a number of articles not mentioned in paragraph 431 and that in paragraph 1426 is found the provision "hair felt, made wholly or in chief value of *animal hair*" and also the provision "cloths and all other manufactures of every description, wholly or in chief value of *cattle hair or horsehair*." (Italics ours.) Importer argues that, since Congress has included certain articles made of certain kinds of hair and made no limitations in this regard as to haircloth, hair seating, and hair press cloth, the rule of *expressio unius est exclusio alterius* applies, and that if Congress had intended to limit "haircloth known as 'crinoline'" to only such haircloth as contained horsehair, as the hair component, it would have said so in definite terms. We think there is considerable force to this argument.

The record in this case, in view of the differences in the materials, presents an entirely different question than the one presented in the *Oberle* case. The Government attempted to prove in the instant case that "haircloth known as 'crinoline' cloth," at the date of the passage of the act, had a commercial meaning different from its common or ordinary meaning and that the haircloth in question was not included within that commercial meaning. In addition to the record in the former case the Government introduced three additional witnesses in a further attempt to establish commercial designation of the term "haircloth." The testimony of the different witnesses was very much in conflict, some of the witnesses stating that they had never heard the word "crinoline" used.

The court below, after carefully considering the disputed testimony, held, as it had held in the former case, that the term "hair-

cloth known as 'crinoline' cloth" had no commercial meaning different from its common or ordinary meaning and that the Government's additional testimony in the instant case was merely cumulative. In discussing the evidence the lower court, through Mr. Justice Brown, said:

In the decided case the Government witnesses admitted that the term "crinoline" was never used in the trade (R. 61, 76, 85, 88, protest 101814–G). The witnesses who testified at the retrial said that, except on very rare occasions, it had not been used for many years prior to the passage of the present tariff act. (R. 14–17, 22, 23, 27, 28.) Obviously, such testimony falls far short of establishing a definite, uniform, and general trade understanding of the term. On the contrary it affirmatively establishes that no such trade understanding existed.

Our examination of the evidence confirms the correctness of the conclusion reached thereon by the lower court. No commercial meaning different from the common meaning has been shown.

The testimony, we think, in so far as it tends to show the common meaning of the words, supports the contention of the importer. Various dictionary and lexicographic definitions follow:

haircloth, n. 1. A fabric having a warp of either cotton or linen yarn with a horsehair filling; formerly much used in upholstery.

2. Cloth made of woven goats' or camels' hair.—*Standard Dictionary.*

haircloth, n. Stuff or cloth made wholly or partly of hair, especially of the hair of the horse or of the camel.—*Century Dictionary and Cyclopedia.*

crinoline, n. 1. A kind of stiff cloth formerly used for making underskirts to expand the gowns worn over them, and now used for linings, etc. It was originally made of horsehair and linen thread. Also, some substitute for this fabric.—*Webster's New International Dictionary.*

crinolin, n. 1. A stiff fabric, originally haircloth; hence, any material for stiffening a skirt, collar, or other part of a garment.—*Standard Dictionary.*

crinoline, n. and a. 1. n. 1. A stiff material originally made wholly or in part of horsehair, whence the name. It was used about 1852 for stiff skirts, and when this fashion was followed by that of wearing greatly projecting skirts of wire steel springs, the word continued to be used generally for the latter. Crinoline is still in use for stiff lining and the like, in the manner of buckram.—*Century Dictionary and Cyclopedia.*

It seems to us that under the common meaning of the term, the imported merchandise is "haircloth known as 'crinoline' cloth." The record and the dictionary definitions support the conclusion that crinoline cloth a half century ago, when used to stiffen the skirts of ladies' dresses, was composed of horsehair in part; that horsehair was stiffer than goat hair and other kinds of animal hair. "Crinoline" is a French word derived from the Latin *crinis*, hair, and *linum*, thread. It is conceded that the material at bar is used for the stiffening of men's coats, principally lapels, fronts, and shoulders, and that the particular kind of stiffening cloth used changed in the interim between its early use and its use on and immediately prior to September 30, 1922, due to the fact that the fashion of men's coats required

less stiffening. We think it is obvious that the common meaning of the word "crinoline" was changed to some extent within the period of half a century and that Congress in using the term in paragraph 1426 had in mind merchandise such as that at bar. This court in *Sheldon & Co.* v. *United States,* 4 Ct. Cust. Appls. 42, 46, T. D. 33265, said:

It is common knowledge that in the lapse of years the ordinary meaning of words may change or may be extended, just as new words may come into use and others become obsolete.

We therefore conclude that the merchandise is described in paragraph 1426. The provisions of paragraph 1426 more specifically describe it than do the provisions of paragraph 1109 when considered with paragraph 1120. *E. & W. H. Caldwell* v. *United States,* 141 Fed. 487.

The Government urges that there is some compelling influence in paragraph 1120 which draws into paragraph 1109 the merchandise at bar, regardless of whether it is described in paragraph 1426 or not. As far as this issue is concerned paragraph 1120 does nothing more than broaden the application of the word "wool" in paragraph 1109 and, with this exception, makes the paragraph no more definite or specific, in its provisions, than if it were considered alone.

Paragraph 1426 for "haircloth known as 'crinoline' cloth" is very definite and specific as applied to this particular merchandise. There are several kinds of haircloth provided for, but the provision under consideration is for a particular kind of haircloth.

The judgment of the United States Customs Court is *affirmed.*

LENROOT, Judge, dissents.